Paul HANSON, Petitioner–Appellant,

v.

Francis PHILLIPS, II, Respondent–Appellee.

Docket No. 04–0940–PR.

United States Court of Appeals, Second Circuit.

Argued: Jan. 18, 2005.

Decided: March 30, 2006.

Kerry A. Lawrence, Briccetti, Calhoun & Lawrence, LLP, White Plains, NY, for Petitioner–Appellant.

Andrew R. Kass, Assistant District Attorney for Orange County, New York (Francis D. Phillips, II, District Attorney, on the brief), Goshen, NY, for Respondent–Appellee.

Before: LEVAL, STRAUB, and KATZMANN, Circuit Judges.

STRAUB, Circuit Judge:

Petitioner–Appellant Paul Hanson ("Hanson") appeals from a judgment of the United States District Court for the Southern District of New York (Colleen McMahon, *Judge*) denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This appeal presents two issues. The first issue is whether we should dismiss this appeal pursuant to the fugitive disentitlement doctrine because Hanson was a fugitive from justice for two months. As Hanson has been apprehended and prosecuted for bail jumping, we conclude that there are no legitimate justifications for dismissing this appeal. The second issue presented is whether the state appel-

late court unreasonably applied *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), in determining that Hanson entered his plea of guilty intelligently and voluntarily. Because the record does not affirmatively disclose that Hanson intelligently and voluntarily pleaded guilty, as required under *Boykin,* we reverse and remand for issuance of the writ.

## I. BACKGROUND

### A. Facts and Procedural History

The basic facts underlying this appeal are undisputed. On March 7, 2002, Hanson appeared with counsel before the Hon. Michael Schwartz, City Court Judge for the City of Middletown, N.Y., on two counts of Aggravated Harassment in the Second Degree and two counts of Criminal Contempt arising from alleged violations of an order of protection then in effect against him. After a series of case calls, conferences, and side-bar discussions, defense counsel and the prosecutor reached a plea arrangement, allowing Hanson to plead guilty to one count of Criminal Contempt in the Second Degree in satisfaction of all the outstanding charges.

The plea colloquy was brief and, as it is central to our decision today, we reproduce the transcript of that hearing in its entirety:

Court: Lisa Sugarman is standing next to you as your attorney. For the record, you are Paul Hanson?

Hanson: Yes.

Court: Understand that after a conference with me and the Assistant District Attorney—

Hanson: Yes.

Court: —a disposition of this matter has been agreed to. They have agreed to a disposition of this matter.

Hanson: Yes.

Court: As I understand it, you have agreed that to cover all of the outstanding charges, Mr. Hanson, you will plead guilty to one Count of Criminal Contempt in the 2nd Degree, which is a Class A Misdemeanor; and understand that I am not putting any sentence limits on this. I will read the [probation] report and based on that probation report, I will determine what sentence you will get, and that can be anything up to one year in Orange County Jail. In addition to that, be advised that any further violation of the Order of Probation that is outstanding will result in a Willfulness Hearing on this, and if, if I feel that you willfully violated the Order of this Court, I have the right to—

Hanson: Yes.

Court: —which will not affect the sentence that will be imposed on anything else. Do you understand that?

Hanson: Yes, sir, your Honor.

Court: Therefore, I suggest that before we do anything else, understand that you are not to go near Maryanne Quirke [sic] anymore. You are not to telephone her. You are not to stay on the same side of the street that she is on. You are not to communicate with her by any means whatsoever. Don't even have a friend talk to her in your behalf. Stay away from her, because if she makes any other reports, and they turn to me with grounds, you will immediately, summarily go to jail for a long time. It is all in your hands. Your attorney has raised certain issues with regard to the sentence, and I told her I am not closing my eyes to any of that stuff. It will all be made available. I just want you to know I am not limiting anything. You can go to jail for up to one year in Orange County Jail. You have to understand that. Your attorney has also advised me that you intend to waive your rights to appeal as part of the plea bargain; is that true?

Hanson: I, I guess I have no choice.

Court: You have a choice. You can go to trial, and we can go forward with the contempt hearing that I told your attorney I was willing to do, which I told her I would do tomorrow morning or tomorrow afternoon. You're—you frustrate me—

Hanson: Yes, your Honor.

Court: —I told you many times, you don't have to be a nice guy, but you have to follow the law.

Hanson: I do, your Honor.

Court: Well, you didn't.

Hanson: I have—

Court: You will now, or the law will follow you. If you don't follow the law, the law will follow you. Be advised of—

Hanson: Yes.

Court: —based on conversations with you, and your conversation with your attorney, on the 14th day of February 2002, were you aware that there was an order of protection in effect, on behalf of Maryanne Quirk signed by this Court? Were you aware of it on that day?

Hanson: Yes, your Honor.

Court: And with that knowledge in violation of that order, did you call Maryanne Quirk on the telephone?

Hanson: Yes.

Court: Knowing that the order of protection directed that you not call her on the telephone?

Hanson: Yes.

Court: All right. I find you guilty of Criminal Contempt in the 2nd Degree, which is an A misdemeanor; Criminal Contempt in the 2nd Degree to cover all of the outstanding charges. I will fix bail pending sentence in the amount of $5,000.00 cash, $50,000.00 bond. I will ROR you on the 00316 of 2002.

Hanson: Yes.

Court: And I will admonish you: Any further violation of the temporary order will result in an immediate Willfulness Hearing, which, as I said, can result in up to 90 days in jail, immediately, which will have nothing to do with any sentence I impose on this.

Hanson: Yes.

Court: I am directing that the District Attorney, if any further violations are filed, will be prepared to make arrangements to go forward with that Willfulness Hearing. Mr. Hanson, do you understand that I don't want anymore communication between you and the lady; all right?

Hanson: Yes.

Court: You are free to go, if you post the bond.

Sugarman: Judge, can we just set a sentence date?

Court: What do you need, two months.

Sugarman: Well, I would say—

Court: He can get less if he's not going to make bail.

Sugarman: No, he will make bail.

Court: That's what I figured. Thursday, May 9th—let's be safe. Do you want to do it in June?

Sugarman: Sure, Judge.

Court: Thursday, June 6, at 1:30. Mr. Hanson, I hope not to see you in Small Claims next week.

Hanson: That's not this side of the Court; that's the other side of Court.

Court: Mr. Hanson, I hope not to see you on this side of the Court.

Hanson also executed a written waiver of his right to appeal.[1]

---

**1.** The waiver agreement addresses only Hanson's right to appeal. The waiver does not concern Hanson's initial decision to plead guilty. Indeed, as the plea colloquy indicates, Hanson believed that he had "no choice" but

Before sentencing, Hanson sought to withdraw his guilty plea, claiming that at the prior hearing he did not understand either the nature of the proceedings or the consequences of his plea. Hanson also claimed that he suffered from a mental impairment caused by a then two-years-old injury sustained in a motorcycle accident. Hanson's motion to withdraw his plea was denied by Judge Schwartz in an unpublished written decision dated June 27, 2002. Judge Schwartz held that given the totality of the circumstances, Hanson's guilty plea was "knowing, voluntary, and intelligent."

Hanson was subsequently sentenced to fifteen days' incarceration to be followed by three years' probation.[2] He appealed his conviction and sentence to the New York State Supreme Court, Appellate Term arguing that his guilty plea was involuntary. The Appellate Term rejected Hanson's claim and unanimously held that "[d]espite defendant's contention to the contrary, we are of the opinion that defendant's plea of guilty was made knowingly, voluntarily and intelligently." *People v. Hanson*, No.2002–1043 OR CR, 2003 WL 21730001 (N.Y.App. Term June 5, 2003) (citing *People v. Harris*, 61 N.Y.2d 9, 471 N.Y.S.2d 61, 459 N.E.2d 170 (1983)). New York State Court of Appeals denied Hanson's application for leave to appeal. *People v. Hanson*, 100 N.Y.2d 582, 764 N.Y.S.2d 392, 796 N.E.2d 484 (2003).

Having exhausted his final state appeal but prior to serving his sentence, Hanson filed a petition for habeas corpus relief in the Southern District of New York under 28 U.S.C. § 2254. The matter was assigned to Judge McMahon, who, in turn,

entered an order referring the matter to Magistrate Judge Lisa Margaret Smith. The District Court also stayed Hanson's sentence pending its resolution of the petition.

In a Report and Recommendation dated November 4, 2003, the Magistrate Judge recommended that the writ be granted because the record underlying Hanson's plea was silent as to Hanson's complete, knowing, and voluntary waiver of essential constitutional rights. The respondent filed timely objections to this recommendation and, in an order dated February 13, 2004, the District Court accepted the report but rejected the recommendation before denying the petition and dissolving the stay. Hanson now appeals the District Court's judgment.[3]

**B. Circumstances Regarding Hanson's Failure to Appear**

After oral argument, respondent filed a motion to dismiss the appeal and revoke our stay of Hanson's state sentence based on the fugitive disentitlement doctrine. Hanson had failed to appear and answer state criminal charges unrelated to those underlying the present appeal. Hanson, through counsel, filed papers in opposition on February 9, 2005, requesting that the case be decided on the merits.

By summary order dated February 17, 2005, we remanded the matter to the District Court to determine, by whatever procedures it deemed necessary and appropriate, the exact circumstances surrounding Hanson's failures to appear in state court. We retained jurisdiction to rule upon the motion and, if appropriate, decide the is-

to waive his right to appeal in order to plead guilty.

**2.** Hanson's sentence was stayed during the pendency of his state court appeals by orders of the Supreme Court of Orange County and the New York State Court of Appeals.

**3.** On March 26, 2004, we granted Hanson's motion to stay the execution of his sentence pending final resolution of his appeal.

sues on appeal once the record had been supplemented. *See United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir.1994).

On April 1, 2005, the mandate was filed with the District Court, which again referred the matter to Magistrate Judge Smith. After consulting with the District Court, the Magistrate Judge determined that she would hold a hearing and prepare a report concerning Hanson's failures to appear in court. The Magistrate Judge met with the parties on two occasions and reviewed various state court transcripts and court papers relating to Hanson's cases. On July 11, 2005, the Magistrate Judge issued a report. Hanson did not object to the Magistrate Judge's Report, and on August 2, 2005, the District Court issued an opinion adopting the Magistrate Judge's report, with two modifications.[4]

The District Court's factual findings are not clearly erroneous. We provide the following summary. In January, 2005, Hanson was a defendant in three separate criminal cases against him: (1) Indictment Number 2004–464 in Orange County Court (one count of Criminal Contempt in the First Degree, three counts of Criminal Contempt in the Second Degree, one count of Stalking in the Third Degree, and one count of Menacing in the Second Degree); (2) Docket Number 03–1358 in City Court for the City of Middletown (Harassment in the Second Degree); and (3) Docket Number 03–1596 in City Court for the City of Middletown (Harassment in the Second Degree). Hanson was found guilty after a

jury trial on all counts in Indictment Number 2004–464 on November 22, 2004.

Hanson failed to appear for both a sentencing on January 24, 2005, in Indictment Number 2004–464, and a conference on February 2, 2005, in the two cases before the City Court for the City of Middletown. Hanson admits that he knew of both proceedings and that he was not in the United States at the time of either the sentencing or the conference. Although he appeared in Middletown City Court on January 19, 2005, he left the United States soon after and arrived in Thailand on January 23, 2005. He subsequently traveled to the United Kingdom, arriving at Heathrow Airport on February 22, 2005.

Hanson attempted to enter Canada from the United Kingdom on either the second or third of March (there is a slight discrepancy in the documentation). Canadian authorities detained him because there were outstanding warrants for his arrest in New York State. On March 14, 2005, Canadian authorities transported Hanson to New York, where he was handed over to law enforcement authorities. The next day, Hanson appeared in Orange County Court on Indictment Number 2004–464 and was remanded without bail.

On March 21, 2005, Hanson was charged with one count of Bail Jumping in the Second Degree. He pleaded guilty to this charge on May 12, 2005. On June 9, 2005, Hanson was sentenced to a term of imprisonment of one and one-third to four years

---

**4.** The District Court correctly struck two sections from the report. The first of these paragraphs contained an affirmative statement from Hanson to the effect that he desired to have his petition decided on the merits and had not intended his absence to impact its resolution. As Hanson invoked his Fifth Amendment right against self-incrimination during the Magistrate Judge's inquest, it was improper for him to offer any affirmative testimony. *See Brown v. United States*, 356 U.S. 148, 155, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958) (holding that a witness who invokes his right against self-incrimination "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts"). The second section was stricken because the District Court concluded that the section exceeded the limited purpose of the remand as it made a finding as to Hanson's intent to impact this appeal through his absence.

on the charges contained in Indictment Number 2004–464. On the bail jumping charge, the court also sentenced Hanson to a term of one to three years to be served consecutively with his other sentence.

We agree with the District Court's rejection of Hanson's explanation his absence—that he traveled abroad to seek medical treatment for his brain injury. The only evidence supporting this claim is a medical report from October 2004 stating that Hanson was "contemplating stem cell procedure/surgery for longstanding right brachial plexus injury." Hanson failed to offer any evidence showing that his absence was the result of medical necessity. Indeed, he failed to come forward with any evidence that he attended any medical appointments while abroad.

## II. DISCUSSION

### A. The Fugitive Disentitlement Doctrine

Federal courts "have authority to dismiss an appeal or writ of certiorari if the party seeking relief is a fugitive while the matter is pending." *Degen v. United States*, 517 U.S. 820, 824, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996). Even if the appellant is no longer a fugitive during the pendency of his appeal, courts have the authority to dismiss a criminal appeal under the fugitive disentitlement doctrine where there is some nexus between "a

defendant's [prior] fugitive status and his appeal." *Ortega–Rodriguez v. United States*, 507 U.S. 234, 249, 113 S.Ct. 1199, 122 L.Ed.2d 581 (1993).

Although we have never dismissed an appeal of a habeas proceeding on fugitive disentitlement grounds, other courts have done so. *See Bagwell v. Dretke*, 376 F.3d 408, 412 (5th Cir.2004) (holding that the doctrine applies in cases under 28 U.S.C. § 2254); *Lopez v. Malley*, 552 F.2d 682, 683 (10th Cir.1977) (applying the fugitive disentitlement doctrine to dismiss a petition for habeas corpus).

There are four independent justifications for disentitlement: (1) assuring the enforceability of a decision against a fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice to promote efficient operation of the courts; and (4) avoiding prejudice to the other side engendered by a defendant's flight. *Bar–Levy v. United States Dep't of Justice*, 990 F.2d 33, 35 (2d Cir.1993). Fugitive disentitlement is an "equitable doctrine" that may be applied at court discretion. *SEC v. Berger*, 322 F.3d 187, 191 (2d Cir.2003).

As Hanson is now in custody and has been prosecuted and sentenced for bail jumping, all of the justifications for disentitlement militate against dismissing this appeal.[5] Any decision we render will be

---

5. We have interpreted the Supreme Court's decision in *Degen* as standing for the proposition that *"in civil cases,* 'the most persuasive justifications for disentitlement are now (1) the inability to enforce a decision rendered by the appellate court, and (2) the need to avoid prejudice to the other party resulting from the defendant's fugitive status.' " *United States v. Awadalla*, 357 F.3d 243, 246 (2d Cir.2004) (quoting *SEC v. Berger*, 322 F.3d 187, 192 (2d Cir.2003)) (internal emphasis in original). Although habeas petitions have historically been treated as civil in nature, *Ventura v. Meachum*, 957 F.2d 1048, 1052 (2d Cir.1992),

they may fall outside the ambit of a "civil action" in certain circumstances. *See Vacchio v. Ashcroft*, 404 F.3d 663, 668 (2d Cir. 2005) (holding that the defendant's habeas petition for a release from immigration detention qualified as a "civil action" under the Equal Access to Justice Act, but that a criminal habeas petition would not). In this context, however, we need not decide on what side of the civil-criminal divide habeas petitions fall because, under either standard, none of the justifications support disentitlement in this case.

enforceable against Hanson. *See Ortega–Rodriguez*, 507 U.S. at 244, 113 S.Ct. 1199 (finding that there were no enforceability concerns because the defendant had been returned to custody); *cf. United States v. Awadalla*, 357 F.3d 243, 246 (2d Cir.2004) (dismissing appeal where fugitive's whereabouts were unknown). His incarceration prevents him from hedging against an unfavorable outcome by being beyond the reach of law enforcement.

There is no need for us to impose a penalty for flouting the judicial process. The Orange County Court has already sentenced Hanson to a term of one to three years for bail jumping. Adding the second punishment of disenfranchisement would introduce the type of "arbitrariness and irrationality into sentencing for escape" that the Supreme Court has cautioned against. *Ortega–Rodriguez*, 507 U.S. at 248, 113 S.Ct. 1199; *see also Degen*, 517 U.S. at 828, 116 S.Ct. 1777. Moreover, using the "blunderbuss" of appellate dismissal, *Ortega–Rodriguez*, 507 U.S. at 247, 113 S.Ct. 1199, in this case to discourage flights from justice to promote efficient operation of the courts is "too blunt an instrument" for advancing that goal, *Degen*, 517 U.S. at 828, 116 S.Ct. 1777. The Orange County Court has already crafted a more appropriate response.

It is true that his flight has given rise to a "flurry of extraneous matters" diverting not only our attention from the merits of this matter, but also the District Court and the Magistrate Judge from other matters on their already crowded dockets. *Ortega–Rodriguez*, 507 U.S. at 245, 113 S.Ct. 1199. Efficient operation of the courts, however, is not a sufficient justification for disentitlement in this case because Hanson is now in custody. *See Ortega–Rodriguez*, 507 U.S. at 245, 113 S.Ct. 1199 ("[E]fficient operation of the appellate process ... will not be advanced by dismissal of appeals filed after former fugitives are recaptured.") (citations and internal quotation marks omitted).

Finally, Hanson's flight has not caused any prejudice to the State *in this case*. Certainly, "a long escape, even if ended before sentencing and appeal, may so delay the onset of appellate proceedings that the Government would be prejudiced in locating witnesses and presenting evidence at retrial after a successful appeal." *Ortega–Rodriguez*, 507 U.S. at 249, 113 S.Ct. 1199 (noting the Eleventh Circuit's position). Hanson's flight lasted only two months and cannot be correctly classified as "a long escape." The delay in this case derives primarily from the nature of the proceeding (a post-conviction habeas petition), the State's motion to dismiss, and the time we have taken to resolve the matter.

Even though Hanson intentionally fled during the pendency of this appeal, we cannot conclude that the relevant justifications for disentitlement apply. Accordingly, we deny the motion and will decide the merits of his appeal.

## B. The Merits of Hanson's Petition

We review *de novo* the District Court's denial of Hanson's petition for habeas relief. *Hines v. Miller*, 318 F.3d 157, 160 (2d Cir.), *cert. denied*, 538 U.S. 1040, 123 S.Ct. 2089, 155 L.Ed.2d 1075 (2003). Hanson's habeas corpus petition is governed by 28 U.S.C. § 2254(d)(1) as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214. Title 28, section 2254(d) provides in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States

28 U.S.C. § 2254(d)(1).

A state court decision is contrary to clearly established federal law, as determined by the Supreme Court, when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495.

It is beyond dispute that the Supreme Court's decision in *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) was, at the time of the Appellate Term's decision, and continues to be "clearly established Federal law" for the proposition that the trial court must produce a record affirmatively showing that the defendant's guilty plea was knowing and voluntary. *See, e.g., Bradshaw v. Stumpf*, —— U.S. ——, 125 S.Ct. 2398, 2405, 162 L.Ed.2d 143 (2005) ("[T]he court taking a defendant's plea is responsible for ensuring 'a record adequate for any review that may be later sought.'") (quoting *Boykin*, 395 U.S. at 244, 89 S.Ct. 1709); *United States v. Dominguez Benitez*, 542 U.S. 74, 84 n. 10, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) ("[W]hen the record of a criminal conviction obtained by guilty plea contains no evidence that a defendant knew of the rights he was putatively waiving, the conviction must be reversed.") (citing *Boykin*, 395 U.S. at 243, 89 S.Ct. 1709); *Parke v. Raley*, 506 U.S. 20, 29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) ("In *Boykin* the Court found reversible error when a trial judge accepted a defendant's guilty plea without creating a record affirmatively showing that the plea was knowing and voluntary."); *Bordenkircher v. Hayes*, 434 U.S. 357, 362, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) (noting "the need for a public record indicating that a plea was knowingly and voluntarily made" under *Boykin* ).

▪ The District Court correctly analyzed Hanson's claim under the "unreasonable application" clause of section 2254(d)(1).[6] Analysis under the "contrary

---

**6.** We note for the sake of completeness that Hanson does not dispute that the Appellate Term adjudicated his claim on the merits. As we held in *Sellan v. Kuhlman*, a state court "adjudicates" a state prisoner's federal claim on the merits when it "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment.... even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." 261 F.3d 303, 312 (2d Cir.2001). "[T]he state court need only dispose of the petitioner's federal claim on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required." *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir.2001).

Although brief, the Appellate Term's statement that Hanson's "plea of guilty was made knowingly, voluntarily and intelligently" and its citation to *People v. Harris*, 61 N.Y.2d 9, 471 N.Y.S.2d 61, 459 N.E.2d 170 (1983) show that it resolved Hanson's claim on substantive grounds. Furthermore, the Appellate Term's citation to *Harris*—a New York Court of Appeals decision interpreting *Boykin* and other Supreme Court cases on the constitutionality of guilty pleas—and the trial court's citation to *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), in its decision and order denying Hanson's motion to withdraw his plea indicates that the Appellate Term was aware of the federal constitutional dimension of the issue on appeal.

to" clause would have been inappropriate because, as discussed below, the case cited by the Appellate Term, *People v. Harris,* 61 N.Y.2d 9, 471 N.Y.S.2d 61, 459 N.E.2d 170 (1983), is not "diametrically different, opposite in character or nature, or mutually opposed" to *Boykin. See Lindstadt v. Keane,* 239 F.3d 191, 198 (2d Cir.2001) (analyzing case under the "unreasonable" application clause where the standard applied by the state court was not "diametrically different, opposite in character or nature, or mutually opposed" to the federal standard) (internal quotation marks omitted); *Harris v. Kuhlmann,* 346 F.3d 330, 344 (2d Cir.2003) (holding that the district court should have analyzed the petition under the "unreasonable application" clause rather than the "contrary to" clause where the state appellate court cited to a state court case that applied the applicable Supreme Court precedent). Nor are the facts of Hanson's case "governed by any case in which the Court encountered a 'materially indistinguishable' set of facts." *Lindstadt,* 239 F.3d at 198. Therefore, relief is appropriate only if the Appellate Term "unreasonably applie[d]" clearly established federal law.

The Appellate Term correctly identified *Harris,* a New York Court of Appeals case applying the holding of *Boykin* and other Supreme Court precedent on the voluntariness of guilty pleas, as containing the appropriate federal legal standard. *See Harris,* 61 N.Y.2d at 17–19, 471 N.Y.S.2d 61, 459 N.E.2d 170; *see also Harris v. Kuhlmann,* 346 F.3d at 344 ("The Appellate Division reviewing Harris's case correctly identified the relevant federal law applicable to Harris's *Batson* claims, because in summarily affirming the trial court it cited a case applying the holding of *Batson.*"). To obtain relief under the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), Hanson must show that the Appellate Term applied the federal principle from *Boykin,* through *Harris,* "to the facts of his case in an objectively unreasonable manner." *See Eze v. Senkowski,* 321 F.3d 110, 124 (2d Cir.2003) (internal quotation marks omitted). A showing that the Appellate Term was merely incorrect is insufficient. *Id.; see also Williams,* 529 U.S. at 410, 120 S.Ct. 1495 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." (emphasis in original)). Rather, "some increment of incorrectness beyond error is required." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000).

▮▮▮▮ "A guilty plea operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, with sufficient awareness of the relevant circumstances and likely consequences." *Bradshaw,* —— U.S. ——, 125 S.Ct. at 2405; (quoting *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (internal quotation marks omitted)). A court may not accept a plea "without an affirmative showing that it was intelligent and voluntary." *Boykin,* 395 U.S. at 242, 89 S.Ct. 1709; *Brady,* 397 U.S. at 747 n. 4, 90 S.Ct. 1463 (noting that *Boykin* stands for the proposition that the "record [on appeal] must affirmatively disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily."). While a trial judge is required to make a record that affirmatively discloses that the defendant's guilty plea is intelligent and voluntary, he or she is not required by federal law to engage in any particular interrogatory "catechism" akin to that required of federal courts by Federal Rule of Criminal Procedure 11. *See Siegel v. New York,* 691 F.2d 620, 626 (2d Cir.1982). The voluntariness of a guilty plea is reviewed by examining the totality of the relevant circumstances. *Willbright v. Smith,* 745 F.2d 779, 780 (2d Cir.1984) (per curiam) (citing *Brady,* 397 U.S. at 749, 90 S.Ct. 1463).

Viewing the record as a whole, we find that it fails to affirmatively disclose that Hanson entered his plea intelligently and voluntarily. We find the record deficient in establishing both the defendant's understanding of the immensely important procedural step he was taking and that he was acting voluntarily. A plea cannot be intelligent unless, at the very least, the defendant understands that he has the right to a trial to determine whether he is guilty, and that, by pleading guilty, he gives up that right and consents to the entry of a guilty verdict, upon which he may be sentenced. A plea is not voluntary unless the defendant understands he is under no compulsion to plead guilty and makes the decision of his own free will.

Nothing in the record affirmatively discloses Hanson's awareness that he had the right to have his guilt determined at a trial and that by pleading guilty he was giving up that right. Nor does the record affirmatively disclose that Hanson voluntarily chose to plead guilty. It is not sufficient that the record contain some references to the right to trial and the nature of the plea. The proceeding must be conducted in a manner that supports a reasonable inference of the defendant's *understanding* of the significance of his plea and of its *voluntariness*. Here, the court ran together a series of confusing questions and statements in such a way that Hanson's occasionally interspersed "yes" answers leave wholly to conjecture the meaning of his responses.

At the start of the allocution, the court said to Hanson that "after a conference with me and the Assistant District Attorney .... They have agreed to a disposition of this matter." The defendant responded "yes." Even assuming Hanson understood that "they" referred to the Assistant District Attorney and his defense attorney, this certainly did not constitute a state-ment to the effect that *Hanson* chose to plead guilty. It does not communicate to us that his plea was voluntary.

The court came close to remedying part of the problem by then saying, "As I understand it, you have agreed [to] ... plead guilty, to one Count of Criminal Contempt in the 2nd degree ...." Had Hanson answered "yes" at this point, this might have established at least his intent to plead guilty. But instead of allowing Hanson to answer the question, the court continued that it was "not putting any sentence limits on this," that the court would read the probation report, that the sentence could be anything up to a year, and that "any further violation of the Order of Probation that is outstanding will result in a Willfulness Hearing on this, and if, if I feel that you willfully violated the Order of this court, I have the right to ...."

At this point Hanson said, "Yes," and the court continued, "which will not affect the sentence that will be imposed on anything else. Do you understand that?" The defendant answered "Yes, sir, your Honor." What Hanson was agreeing to is once again entirely a matter of conjecture.

The court resumed, warning Hanson to stay away from Maryanne Quirk, the beneficiary of the court's prior protective order, and warning him that "if she makes any other reports, and they turn to me with grounds, *you will immediately, summarily go to jail for a long time.*" (emphasis added) (A characterization which suggests that an accused defendant has no right to trial.) The court continued that defense counsel had indicated "that you intend to waive your rights to appeal as part of the plea bargain." Hanson answered, "I, I guess I have no choice." This certainly fails to show that the defendant was pleading voluntarily or that he understood his right to chose between trial and a guilty

plea. In fact, it suggests quite the opposite.

The court responded, "You have a choice. You can go to trial and we can go forward with the contempt hearing that I told your attorney I was willing to do, which I told her I would do tomorrow morning or tomorrow afternoon. You're—you frustrate me—."

The defendant responded, "Yes, your Honor," but in context there is no way of telling whether this meant that the defendant understood his right to trial, or was simply acknowledging the judge's angry assertion that he was causing the judge frustration.

The court then entered the only part of the colloquy in which questions were asked and answered in a comprehensible manner. The court asked the defendant if he was aware, on February 14, 2002, of the order of protection on behalf of Maryanne Quirk. Hanson answered in the affirmative. The court asked whether, with that awareness, he called Maryanne Quirk; Hanson acknowledged doing so. The court also asked whether Hanson made the call, knowing that the order of protection directed that he not call her; Hanson admitted that he had. The court then concluded, "All right, I find you guilty of Criminal Contempt in the 2nd Degree, which is an A misdemeanor; Criminal Contempt in the 2nd degree to cover all of the outstanding charges."

By the end of the colloquy, the defendant acknowledged that he had committed the offense for which he was being prosecuted. But no part of the dialogue provides any reasonable assurance that Hanson voluntarily chose to plead guilty or understood that by doing so he was giving up the right to a trial.[7] If anything, the colloquy casts doubt on the intelligence and voluntariness of his decision. Hanson's "yes" answers followed such a confusing mixture of questions and statements by the court as to leave wholly unclear what his answers referred to.

While we recognize that no particular form or script is required and that state courts have considerable leeway to establish a record in whatever reasonable manner they see fit, *Boykin* established that the record of a guilty plea must affirmatively disclose that the defendant made his plea intelligently and voluntarily. We can find no such assurance in this record.

As the District Court acknowledged, there is circumstantial evidence that Hanson may have been aware of the trial right he was waiving when he entered his guilty plea. Hanson has a criminal history that dates back to 1980 when he pleaded guilty to the misdemeanor crime of Forgery in the Third Degree. Notwithstanding the circumstantial evidence, the record is bereft of any *affirmative evidence* indicating that Hanson was aware of the alternative to pleading guilty at the time he entered his guilty plea or that he entered his plea voluntarily.

The role of Hanson's attorney in this plea colloquy demands closer attention. Hanson was represented by an experienced defense attorney, who had represented him on prior occasions. We have stated previously that "a significant factor

7. Judge Leval would note further, although recognizing that Hanson did not make this argument, that Hanson was never asked how he pleaded and never uttered words to the effect that he was pleading guilty. To be sure, Hanson acknowledged acts that constituted the offense, but as the Supreme Court stressed in *Boykin*, admitting having done the acts that violated the law is a different thing from pleading guilty, which is a formal consent to the entry of a guilty verdict. *See Boykin*, 395 U.S. at 242, 89 S.Ct. 1709 ("A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.").

in determining whether a plea is intelligently and voluntarily entered is whether it was based on the advice of competent counsel." *Willbright,* 745 F.2d at 781 (citing *Siegel,* 691 F.2d at 626 n. 6). The "affirmative disclosure" requirement may be met if the record shows that the defendant consulted with his attorney about the consequences of a guilty plea. *See North Carolina v. Alford,* 400 U.S. 25, 29 n. 3, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (stating that *Boykin* was satisfied because the record from the state court hearing on post-conviction relief affirmatively disclosed that "Alford had been fully informed by his attorney as to his rights on a plea of not guilty and as to the consequences of a plea of guilty").

The record does not affirmatively disclose whether Hanson consulted with his attorney regarding the consequences of his plea. Judge Schwartz delayed the calling of the case twice. These delays, however, were for Hanson's attorney to negotiate a plea with the Assistant District Attorney and not to consult with her client. Certainly, as found by Judge Schwartz, Hanson had "opportunities" to consult with his attorney. Under *Boykin,* however, we may not infer that Hanson availed himself of these opportunities. In *Boykin,* the defense counsel was appointed three days prior to the defendant's arraignment and guilty plea. *Id.* at 239, 89 S.Ct. 1709. The Court did not infer a knowing waiver from the defendant's three-day "opportunity" to consult with his client, and we decline to do so here.

For the foregoing reasons the Appellate Term's conclusion that Hanson "knowingly, voluntarily and intelligently" entered his guilty plea was an unreasonable application of *Boykin.* It may well be that Hanson, in fact, understood his alternatives, but we are unable to conclude so based on this record, and it is the trial court's responsibility to ensure "a record

adequate for any review that may be later sought." *Boykin,* 395 U.S. at 244, 89 S.Ct. 1709.

In rejecting the Magistrate Judge's recommendation to grant the writ, the District Court stated its concern that enforcement of these constitutional duties would, by establishing catechismal rites previously unrecognized in New York law, create chaos in the state criminal courts. Of course, convenience of habit cannot excuse state officials from their constitutional duties. Regardless, we are not persuaded that either New York state law or judicial practice will be upset by our decision today, which, as we have said, does no more than to reaffirm long-standing duties of substance; we impose no new strictures as to form.

This calm is informed first by the fact that New York courts have long recognized their duty to provide a record on guilty pleas that is sufficient to show that the plea is intelligent and voluntary. For example, in *People v. Harris* the New York Court of Appeals declared that:

> [A] record that is silent will not overcome the presumption against waiver by a defendant of constitutionally guaranteed protections. To be sure, the record must show an intentional relinquishment or abandonment of a known right or privilege.... Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused intelligently and understandingly rejected his constitutional rights. Anything less is not waiver.

61 N.Y.2d 9, 17, 471 N.Y.S.2d 61, 459 N.E.2d 170 (1983) (citations, internal quotation marks, and alterations omitted). In addition, while our view of the wide expanse of New York pleading practice is necessarily limited, we are persuaded that it is the common and general practice of

New York judges to engage pleading defendants in colloquies, sometimes wisely enshrined in formal, written waivers,[8] that, though various in style, are sufficient to meet the minimal requirements imposed by the federal constitution.[9] *See, e.g., Nesby v. Senkowski,* No. 93 Civ. 6114, 1994 WL 613322, at *2–*3 (S.D.N.Y. Nov.7, 1994) (reciting record of state court establishing that *Boykin* was satisfied); *Pendleton v. Scully,* 664 F.Supp. 100, 101 (S.D.N.Y.1987) (documenting state trial court's twice-repeated warning to a criminal defendant that "by pleading guilty he would be waiving the right to a jury trial, the privilege against self-incrimination and the right to confront his accusers."). Based on New York law and these snapshots of New York practice, we do not expect that our holding today, reaffirming the requirement, set forth in *Boykin,* that judgments entered after guilty pleas must be founded upon records sufficient in their totality to show intelligent and voluntary waiver of the protections guaranteed by the Constitution of the United States, will either shock our state court colleagues or do damage to the venerable precedents established by our state brethren. Let us reiterate: this opinion should not be understood to require a trial judge to ask any specific questions of the defendant, whether concerning specific constitutional rights or otherwise. But, if *Boykin* is to have any meaning at all, there must be some evidence on the record which affirmatively discloses that the defendant understood the alternative to pleading guilty.

As we can presume nothing from a silent record, we conclude that the Appellate Term "unreasonably applied ... clearly established Federal law as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), by affirming the judgment against petitioner based on this record because it does not affirmatively disclose that Hanson intelligently and voluntarily pleaded guilty.

## III. CONCLUSION

For these reasons, we DENY the motion to dismiss, REVERSE the order of the District Court denying the petition for a writ of habeas corpus, and REMAND the case with instructions to the District Court to issue a writ of habeas corpus, unless within 90 days the state of New York vacates Hanson's plea of guilty and allows him to plead anew.

---

8. One such waiver, identified by counsel as being used by Westchester County courts, is part of the record before us. While New York courts labor under no federal constitutional duty to use such forms, we think it worth noting that had the record of Hanson's plea included such a detailed waiver, the concerns with silence stated in *Boykin* and *Harris* would have no application here.

9. This record is, according to our review of procedures followed by other New York courts, not reflective of common practice in the state courts.